UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| JOHN MAAS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   NO. 2:20-cv-00051 |
| | ) |
| BP EXPLORATION AND | ) |
| PRODUCTION, INC., and BP | ) |
| AMERICA PRODUCTION COMPANY, | ) |
| | ) |
|     Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Maas is suing Defendants BP America Production Company and BP Exploration and Production, Inc. (collectively, "BP") under a class action medical settlement agreement ("MSA") reached after the 2010 oil spill at BP's Deepwater Horizon Rig ("DHR"). Mr. Maas assisted in the clean-up efforts that followed the oil spill. He alleges he was exposed to toxic substances during the clean-up and developed asthma and reactive airways disease as a result. He seeks damages pursuant to a provision of the MSA that permits plaintiffs to recover for health conditions that did not manifest until after the MSA was finalized.

Before the Court is BP's Motion for Summary Judgment. (Doc. No. 85). The motion argues Mr. Maas has not presented sufficient evidence of a causal link between his exposure to toxic substances and his health conditions. The Court disagrees. The Court will deny BP's request for summary judgment.

**I.    BACKGROUND**

The DHR was located 130 miles southeast of New Orleans, Louisiana. (Doc. No. 1 ¶ 12). There, BP drilled for oil in the Macondo Well. (Id.). On April 20, 2010, an explosion onboard

the DHR and a "blowout" of the Macondo Well occurred. (Id. ¶¶ 12–13). Crude oil and hydrocarbons were released into the water and the air. (Id. ¶ 14).

BP and several government agencies attempted to contain the fallout from the DHR explosion. (Id. ¶¶ 16–17). Mr. Maas assisted in the response effort as a clean-up worker and boat captain. (Id. ¶ 23). He alleges that, during its response, BP "purchased highly noxious chemical dispersants . . . which were sprayed over large areas that contained oil." (Id. ¶ 17). The dispersants included Corexit EC9500A and Corexit EC9527A (collectively, "Corexit"). (Id. ¶¶ 17–20).

Mr. Maas claims that for two months, during the clean-up, he was exposed to Corexit around 12 hours per day. (Doc. No. 86-3 at 2, 4). He and his crew members would "personally observe[] the spraying of Corexit from airplanes, in their immediate vicinity." (Id. at 5). Afterwards, they would "immediately experience[] severe eye, nose, and throat burning." (Id.).

Once the initial clean-up efforts ceased, litigation produced the MSA. (See Doc. No. 86-5). The MSA contains a Back-End Litigation Option ("BELO") provision that permits clean-up workers to sue for physical conditions manifested after the parties reached the MSA. (Id. at 67). The MSA defines issues that parties may and may not litigate in BELO cases. (Id. at 78). It is governed by "General Maritime Law." (Id. at 202).

On January 29, 2020, Mr. Maas filed the instant suit pursuant to the MSA's BELO provision. (Doc. No. 1 ¶ 3). He alleged he developed asthma and reactive airways disease due to his exposure to Corexit during the DHR clean-up. (Id. ¶ 27). As proof, he offered expert reports from Dr. Charles Wray and Dr. Veena Antony. (Doc. Nos. 86-1, 86-3). Dr. Wray specializes in pulmonology and has treated Mr. Maas for "severe asthma and restrictive lung disease" since 2019. (Doc. No. 86-3 at 2). Dr. Antony is a professor and practitioner with expertise in pulmonary medicine who has performed "extensive research pertaining to the potential toxic respiratory

2

effects of crude oil, particularly when mixed with . . . 'Corexit.'" (Doc. No. 86-1 at 2–3).

On September 24, 2021, BP moved for summary judgment, arguing Mr. Maas' experts cannot establish the causation requirement of his claim. (Doc. No. 85). BP's motion has been fully briefed. (Doc. Nos. 85, 86, 101, 105).

## II. LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where there is "evidence on which the jury could reasonably find for the [non-moving party]." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party moving for summary judgment "has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Id. If the moving party meets its burden, the nonmoving party must "show specific facts that reveal a genuine issue for trial" using deposition testimony, affidavits, or other evidence. Laster v. City of Kalamazoo, 746 F.3d 714, 726 (6th Cir. 2014).

When evaluating a summary judgment motion, the Court must view the record "in the light most favorable to the nonmoving party." Id. It must also accept the nonmoving party's evidence "as true" and "draw all reasonable inferences in [its] favor." Id. The Court "may not make credibility determinations nor weigh the evidence" in its analysis. Id. It "need consider only the cited materials" but "may consider other materials in the record" if it wishes. Fed. R. Civ. P. 56(c).

## III. ANALYSIS

The parties dispute whether Mr. Maas has presented sufficient evidence that his exposure to Corexit caused his injuries. (Doc. No. 86 at 10; Doc. No. 101 at 1). "In a toxic-tort case, as

3

here, the plaintiff must establish both general and specific causation."[1] Pluck v. BP Oil Pipeline Co., 640 F.3d 671, 676 (6th Cir. 2011); see also Seaman v. Seacor Marine L.L.C., 326 F. App'x 721, 724 (5th Cir. 2009). The Court will deny BP's request for summary judgment because Mr. Maas has presented adequate evidence of both types of causation.

A.      Mr. Maas Has Presented Sufficient Evidence of General Causation.

Summary judgment is not appropriate on the issue of general causation. To demonstrate general causation, a plaintiff must prove the substance in question is "capable of causing" his injury. Pluck, 640 F.3d at 676. Mr. Maas offers the expert reports of Dr. Antony and Dr. Wray. (Doc. Nos. 86-1, 86-3). Dr. Antony attests that Corexit exposure can "produce long-term respiratory issues, such as asthma." (Doc. No. 86-1 at 6). Dr. Wray avers that "Corexit is an acknowledged, highly toxic chemical irritant to human contact, particularly in the sensitive respiratory airways," which can cause asthma and restrictive lung disease. (Doc. No. 86-3 at 5). Mr. Maas' expert reports are sufficient to establish general causation at this stage of litigation.

BP appears to argue Mr. Maas fails the general causation standard because he has not identified the substance to which he was exposed with sufficient particularity. (See Doc. No. 86 at 12). BP claims Mr. Maas' experts identified "[n]o chemical" causing Mr. Maas' conditions and "merely opined that his purported injuries were caused generally by 'Corexit.'" (Id.). But the law does not require more specificity than that. See Gass v. Marriott Hotel Servs., Inc., 558 F.3d 419,

---

[1] The Sixth Circuit has not determined the causation standard applicable to BELO suits and the Fifth Circuit (where most BELO cases arise) has declined to "decide whether the toxic tort standard or another causation standard applies to BELO litigation." McGill v. BP Expl. & Prod., Inc., 830 F. App'x 430, 434 n.2 (5th Cir. 2020). However, district courts have a "practice of applying the toxic tort causation standard in BELO litigation." Salmons v. BP Expl. & Prod. Inc., No. 1:20-CV-38-LG-RPM, 2021 WL 2149206, at *4 (S.D. Miss. May 26, 2021). And both parties agree the Court should employ that practice here. (Doc. No. 86 at 10; Doc. No. 101 at 2). Accordingly, the Court will apply the toxic tort standard, which is the same under both Fifth and Sixth Circuit precedent. Compare Pluck, 640 F.3d at 67, with Seaman, 326 F. App'x at 724.

4

422, 430–31 (6th Cir. 2009) (rejecting defendants' argument that plaintiffs could not establish causation because they "d[id] not know exactly which chemical they were exposed to" after a hotel's exterminator allegedly "sprayed their belongings with an unknown pesticide and filled their hotel room with toxic vapors" where the Material Safety Data Sheets for "at least two of the pesticides commonly used" in the hotel indicated the pesticides were hazardous)[2]; McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1045 (2d Cir. 1995) (expert testimony that "hot-melt glue fumes" caused plaintiff's injury "provided an ample basis to carry the issue to the jury"). And BP's argument that Mr. Maas has not identified a "chemical" to which he was exposed is difficult to understand given that (1) BP does not provide the definition of the term "chemical" on which it is relying (Doc. No. 86 at 12) and (2) both Corexit EC9500A and Corexit EC9527A appear to fit within the definitions of that term that are readily available to the Court.[3] Indeed, the Sixth Circuit seems to believe that substances similar to Corexit count as "chemicals." E.g., Gass, 558 F.3d at 432–33 (describing a pesticide spray known as "Demand CS" as a "chemical" capable of causing plaintiffs' injuries). To the extent BP argues it is entitled to summary judgment based on Mr. Maas' failure to present evidence of general causation, BP's argument fails.

B. Mr. Maas Has Presented Adequate Evidence of Specific Causation.

Mr. Maas also passes summary judgment on the issue of specific causation. Specific causation exists where a toxic substance actually "did cause" a plaintiff's injury. Pluck, 640 F.3d

---

[2] It is important to note, in view of Gaas, that Mr. Maas' experts relied on the Material Safety Data Sheets for Corexit in forming their opinions. (Doc. No. 86-2 at 17; Doc. No. 86-3 at 3).

[3] "A chemical is any substance that has a defined composition. In other words, a chemical is always made up of the same 'stuff.'" https://www.nrc.gov/reading-rm/basic-ref/students/science-101/what-is-a-chemical.html (last visited December 17, 2021); see also https://www.merriam-webster.com/dictionary/chemical (defining a "chemical" as "a substance obtained by a chemical process or producing a chemical effect") (last visited December 17, 2021).

at 677.  To prove specific causation, Mr. Maas must show his "level of exposure" to Corexit "was sufficient to induce the complained-of medical condition."[4]  Id.  According to Dr. Wray, Mr. Maas' exposure to Corexit "on a daily basis, for approximately twelve (12) hours per day for two (2) months," combined with a "differential diagnosis" excluding other possible sources of Mr. Maas' conditions, makes Corexit the "'probable' source of his severe pulmonary problems."[5]  (Doc. No. 86-3 at 2, 4).  A reasonable jury could find this evidence establishes specific causation.

BP attacks Mr. Maas' specific causation evidence by pointing out that his experts relied on information that he provided to them.  (See Doc. No. 86 at 13).  But that is permitted by the Federal Rules of Evidence.  Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."); McCullock, 61 F.3d at 1044 (expert's testimony was properly admitted where the expert based his opinion on, among other things, the plaintiff's "medical history . . . as she related it to him").  BP's arguments "merely go to the weight, as opposed to the admissibility, of the expert testimony" in this case.  United States v. Ramer, 883 F.3d 659, 680 (6th Cir. 2018).  BP's criticism of the bases of Mr. Maas' expert opinions does not undermine the Court's decision regarding specific causation.

BP further argues Mr. Maas has not raised adequate evidence of specific causation because he has not shown the specific "dose" of Corexit to which he was exposed.  (Doc. No. 86 at 12).  However, Mr. Maas does not have to establish he was exposed to a specific dose of Corexit to

---

[4] According to the terms of the MSA, Mr. Maas' "[e]xposure" to "dispersants" like Corexit "need not be proven and may not be litigated." (Doc. No. 86-5 at 78).  However, the "level and duration" of his exposure may be litigated.  (Id. at 77).

[5] Dr. Wray noted that "even minimal Corexit exposure can cause severe cell damage" and its toxic effect may be enhanced in "the sensitive respiratory airways."  (Doc. No. 86-3 at 6).  Plus, Dr. Wray pointed out that Mr. Maas is not a smoker, has "no family history" of respiratory conditions, and had no "pre-existing respiratory problems prior to his exposure to Corexit."  (Id. at 4).

prove specific causation. Hardyman v. Norfolk & W. Ry. Co., 243 F.3d 255, 265–66 (6th Cir. 2001) (citation and quotation omitted) ("[W]hile precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation."). BP's own authority shows that in addition to evidence of "dose," a "differential diagnosis" is an "appropriate method for making a determination of causation for an individual instance of disease." Pluck, 640 F.3d at 678. As discussed, Dr. Wray performed a "differential diagnosis" indicating Corexit caused Mr. Maas' conditions. (Doc. No. 86-3 at 2, 4).

Finally, BP contends this case resembles McGill v. BP Expl. & Prod. Inc., No. 1:18CV159-LG-RHW, 2019 WL 6053016 (S.D. Miss. Nov. 15, 2019), a BELO suit based on Corexit exposure in which the court granted summary judgment due to the lack of specific causation evidence. (Doc. No. 105 at 4–5). That case is inapposite. The McGill court specifically noted that the plaintiff's key expert had no knowledge of the extent of the plaintiff's exposure to Corexit. McGill, 2019 WL 6053016, at *3. For instance, the expert had no information regarding the "number of days or hours" during which the plaintiff was exposed to Corexit and no information about whether the plaintiff was exposed "through inhalation or skin contact." Id. Dr. Wray, conversely, specifically, used such information in forming his opinion. (Doc. No. 86-3 at 2, 6). Summary judgment is not warranted on the issue of specific causation.

C. BP's Argument that Mr. Maas' Expert Reports "Must Be Stricken" Is Unavailing.

BP argues Mr. Maas' expert reports "must be stricken" because they were not "prepared" by Mr. Maas' experts as required by Federal Rule of Civil Procedure 26. (Doc. No. 86 at 13). BP relies on deposition testimony that indicates Mr. Maas' counsel physically typed the expert reports

7

of Dr. Wray and Dr. Antony. (See Doc. No. 86 at 15 (citing Doc. No. 86-2 at 7; Doc. No. 86-4 at 5)). But a "party's attorney can reduce an expert's oral opinion to writing so long as the report reflects the actual views of the expert." United States v. Kalymon, 541 F.3d 624, 638 (6th Cir. 2008). Here, the record shows Dr. Wray's and Dr. Antony's reports contain their "actual views."

Dr. Antony's report includes her views. In her deposition, she recognized her report as her own, confirmed she signed it, confirmed it contained her opinions, and confirmed it included the information she considered in arriving at those opinions. (Doc. No. 86-2 at 7). She admitted she "did not sit down at [her] computer and type out th[e] report" because it was "probably drafted in depth and detail" by Mr. Maas' counsel. (Id.). But she reviewed the report when it was complete to ensure it was "correct" and ultimately "signed off on it." (Id.). That is permissible. Kalymon, 541 F.3d at 638. Because Dr. Antony's report contains her actual views, it need not be stricken.

Dr. Wray's report also contains his views. Dr. Wray recognized his report as his own during his deposition and confirmed that he had signed it. (Doc. No. 86-4 at 5). He also made clear that he "expressed an opinion" in his report regarding Mr. Maas' asthma and its causes. (Id.). And he described the material on which he relied to form that opinion, including records and information from Dr. Antony, Mr. Maas, the EPA, and tests performed on Mr. Maas. (Id. at 6–7). True, Dr. Wray agreed that he "did not author" his expert report. (Id. at 5). But there is "nothing inherently nefarious in this" when viewed in context; it appears Dr. Wray was merely confirming he did not physically type out his report. Kalymon, 541 F.3d at 637–38. Like Dr. Antony's report, Dr. Wray's report includes his actual views and the Court is not required to strike it.

IV. CONCLUSION

For the reasons outlined above, BP's Motion for Summary Judgment (Doc. No. 85) is **DENIED**.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE